# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Tammy Taimisto, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 CV 50167 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tammy Taimisto brings this action under 42 U.S.C. §405(g), challenging the decision denying her disability benefits. For the reasons stated below, the decision is affirmed.

## BACKGROUND

On May 13, 2011, plaintiff applied for disability insurance benefits. She initially complained about depression, suicidal thoughts, bipolar disorder, chronic back problems, and wrist pain. R. 137. In this appeal, she focuses on an alleged blood disorder (or perhaps several), a condition she describes as complicated and still not fully understood by her doctors.

A hearing was held before an administrative law judge ("ALJ") on March 25, 2013. Plaintiff was 53 years old. Her counsel made the following opening statement focusing on her psychological problems:

> Ms. Taimisto's testimony will be that she's disabled due to depression, anxiety disorder, and borderline personality disorder. Her psychological conditions significantly limit her ability to focus and maintain concentration. She has some difficulty speaking and with word recognition at times. She also has back pain that would prevent her from performing the lifting required with her past relevant work. Given her age, she should be found disabled under GRID Rule 201.12 if not found to meet Listings 12.04, 12.06, or 12. 08.

1

R. 32. Counsel did not mention plaintiff's blood disorder. However, plaintiff raised this issue in response to the ALJ's question about whether she had difficulty driving, stating: "I was also diagnosed with aplastic anemia, which they said affects my balance and my memory, and I have very low red, white, and platelet counts." R. 34.[1] This disorder caused her to, among other things, "swerve to the left" while driving and walking. *Id.*

After plaintiff testified, a medical expert, Dr. Laura Rosch, testified. Because plaintiff's main argument is based mostly on this testimony, the Court will quote it in its entirety.

### Examination of Medical Expert by Administrative Law Judge

Q      Doctor, do you have any questions you'd like to ask the claimant?

A      No, your honor.

Q      Okay. Would you outline her impairments.

A      Yes, your honor. Review of the file shows the claimant has a history of migraine headache[s]. The detailed progress note indicated at Exhibit 21F that the claimant has been treated for migraine—there's evidence that it's not an irretractable [phonetic] migraine. She also has been treated for diabetes mellitus. There was no evidence of end-organ –

Q      What?

A      Diabetes.

Q      Oh, okay.

A      No evidence of end-organ damage. The claimant also is overweight. She's a height of 63 inches, 164 pounds with a body mass index of 29. In addition, she has had a history of alcohol abuse. And noted in the record also at 21F and detailed in 18F is a consultative report—the claimant had a low white blood cell count. I did not see evidence of transfusion—requirement for transfusion. I did not see a detailed bone marrow biopsy or hematologic evaluation for that condition. The claimant has also been treated for hypothyroidism, according to the record at 20F. She also carries a diagnosis of depression at the consultative

---

[1] Aplastic anemia is a blood disorder characterized by a greatly reduced formation of erythrocytes and hemoglobin, which affects the concentration of oxygen-transporting material. Anemia is frequently manifested by pallor of the skin, shortness of breath, heart palpitations, lethargy and fatigue. Steadman's Medical Dictionary, 78 (28th ed. 2006).

report, which I will not discuss as I am not a psychologist. She's also been treated for a lumbar sprain and low back pain. I did not see any neurologic findings such as dropped foot, decreased range of motion, positive straight-leg raise, impaired gait, or use of an assistive device. And I think that constitutes the totality of my review of the file, your honor.

Q  She kept mentioning this aplastic anemia. Do you know what she's talking about?

A  Yes. And I have only up through 23F. I don't know if additional evidence was procured, and I did not see this as a condition that was persisting, nor did I see a transfusion, nor did I see a recent evaluation with a bone marrow biopsy or evaluation. At the time, it is noted in the record that she had used alcohol, and this may be a factor; however, I didn't see current evidence as it related to this, your honor.

Q  Okay you got through 23F, is that correct?

A  Yes, your honor.

Q  I think that's all the exhibits and more. Apparently, there were two additional exhibits sent in. They were sent in a long time ago, and I have to admit them—24F and 25F. I don't know anything about them—what's in them. Okay. So what restrictions would you place on her ability to stand, walk, sit, lift, and carry?

A  Yes, your honor. I think that the combination of impairments would limit this.

Q  Combination of impairments would what?

A  Would restrict her to light exertional functioning, your honor.

Q  Okay. Would there be any restrictions on ladders, ropes, and scaffolds and posturals?

A  I think that probably given her degenerative arthritis, I would restrict her use of ladder, rope, and scaffolding to never, and only occasionally ramp and stairs and stoop.

ALJ:  Okay. All right. Counselor, your witness.

**Examination of Medical Expert by Claimant's Attorney**

Q  Doctor, in June of 2011, Dr. Vaywong's [phonetic] recommended a lifting limitation of 10 pounds; is that correct?

A  I—I'm sorry what exhibit was that in? Is that in 20F?

3

Q   That was in 1F.

A   1F. Okay. Sorry. I don't have the date written down for that. Can you tell me the date? I'm opening the record again.

Q   Again, it was June 3rd of 2011.

A   June 3rd of 2011. Okay.

Q   Now, that was a restriction based on her back complaints; is this correct?

A   I'm sorry. I can't hear you.

Q   That was a restriction based on her lower back condition; is that correct?

A   Right. It—I didn't—right. It was a lumbar sprain.

Q   And she continued to have complaints to her lower back in the medical records; is that correct?

A   I did note multiple complaints of back pain, yes; however, there is kind of a paucity of details—objective findings for that.

Q   And Dr. Ranchandani [sic] in his consultative evaluation in October—he diagnosed arthrology of the lumbar spine and left hip joint, likely due to osteoarthritis; is that correct?

A   Yes.

Q   Could the osteoarthritis and arthrology in her lumbar spine cause her pain with lifting or with standing and walking?

A   According to this record, this claimant has allegations of pain with lifting and walking, yes.

Q   And that's something that's consistent medially? I mean, that is something that can cause pain, correct?

A   Sure.

ATTY:  Okay, I have nothing further for the doctor, your honor.

R. 46-50.

On April 12, 2013, the ALJ found plaintiff not disabled. The ALJ held that plaintiff had the following severe impairments: "migraine headaches, diabetes, alcohol abuse, low white blood count, hypothyroidism, lumbar strain, wrist pain, depression, anxiety, and possible personality disorder." R. 12. The ALJ found that plaintiff did not meet any listing. This analysis concentrated on plaintiff's psychological impairments. In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff could do light work. On the issue of plaintiff's blood disorder, the ALJ discussed much of the evidence in the narrative portion of the opinion and then provided the following more explicit analysis:

> The claimant's physical impairments do not significantly limit her ability to function, although the claimant made a lot out of some blood disorder, which she alleged affected her ability to think; however, neither the medical expert or the undersigned found much in treatment records showing a chronic blood disorder. Per the medical expert, there is some evidence of an acute condition, but nothing that was significantly ongoing.

R. 20. The ALJ stated that there were no opinions from treating or examining physicians "indicating that the claimant is disabled or even has limitations greater than those determined in this decision." R. 21. The ALJ noted that the RFC determination was supported by the opinions of State agency physicians. The ALJ gave the opinion of Dr. Rosch "great weight" and found that plaintiff lacked credibility. *Id.*

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the

5

decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014); *Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2014).

In her opening brief, plaintiff's primary argument is that the medical expert and the ALJ made mistakes about, or ignored evidence relating to, her blood disorders. Plaintiff claims that Dr. Rosch made four specific errors. Before addressing them, several background points should be noted. First, although plaintiff now focuses solely on her blood disorders, at the hearing, her counsel ignored this condition. As noted above, counsel's opening statement only referred to plaintiff's psychological problems and back pain and did not refer to any blood disorder. After Dr. Rosch testified, plaintiff's counsel asked no follow-up questions about the blood disorder, although he did ask questions about her back problems.

Second, even now, after numerous doctors, including a hematologist, have treated plaintiff, it is still unclear what precise blood disorders (if any) she has. A number of medical

labels, all seemingly related to blood disorders, are sprinkled throughout the parties' briefs.[2] But it is not clear what they mean. For example, are some merely symptoms, as opposed to fully-diagnosed conditions? It is undisputed that plaintiff was found on numerous occasions to have a low white blood cell count. But this raises the question: what was causing this problem? Plaintiff's doctors (including her hematologist) tried to answer this question but never reached any definitive conclusions insofar as this Court can tell, although they offered various possible explanations. At the hearing, however, plaintiff herself seemed more confident that she had the specific condition of aplastic anemia. *See* R. 34. In her briefs, plaintiff and her counsel are more equivocal. At certain points, they suggested she did have aplastic anemia.[3] But at other times, they speculated whether she might have different overlapping disorders.[4]

Third, related to the above point, the ongoing uncertainty about plaintiff's conditions leads naturally to the burden of proof. In social security cases, two basic duties co-exist side by side, sometimes in an uneasy alliance. On the one hand, it is the plaintiff—not the ALJ—who bears the burden of establishing that she is disabled. *See* 20 C.F.R. § 416.912 ("In general, you have to prove to us that you are blind or disabled."). And when the plaintiff is represented by counsel, the court presumes that the best case was presented to the ALJ. *Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007) ("a claimant represented by counsel is presumed to have made his best case before the ALJ"); *Hawkins v. Chater*, 113 F.3d 1162, 1167-68 (10th Cir. 1997) ("Thus,

---

[2] These include "low white blood cell count," "aplastic anemia," "neutropenia," "anemia," "thrombocytopenia," "pancytopenia," "hematopoiesis," and "myelodysplastic syndrome." *See, e.g.*, Dkt. #12 at 1-3; Dkt. #13 at 4-5.
[3] For example, she begins her fact section with this statement: "Ms. Taimisto first complained of symptoms *consistent with* aplastic anemia in 2008, when she first sought treatment for leg cramping (Tr. 252)." Dkt. #12 at 1 (emphasis added) (footnote symbol omitted). To support the latter statement, plaintiff does not cite to a diagnosis by any doctor, but instead includes a footnote where she lists the symptoms of aplastic anemia as taken from the Mayo Clinic website. The suggestion is that her self-reported symptoms match up with those listed on the website.
[4] *See* Dkt. # 12 at 5 n.3 ("Ms. Taimisto has multiple diagnoses related to her blood disorders, thus it would appear that she has not one, but multiple conditions. Perhaps they are all a part of one overlying condition, such as aplastic anemia, but the medical records are not clear as to this and certainly the medical expert's testimony provides no clarity as to the issue.").

in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues required for further development."). On the other hand, the ALJ has a duty to develop a full and fair record, a duty more exacting if plaintiff is *pro se*. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Relying more on the latter duty, plaintiff argues that Dr. Rosch "fail[ed] to clarify the effect" that plaintiff's blood disorders had on her ability to work. Dkt. #12 at 4. To address this uncertainty, plaintiff proposes that the ALJ on remand could "[submit] medical interrogatories to Ms. Taimisto's hematologist." *Id.* at 6.

With these points in mind, the Court turns to plaintiff's specific criticisms of Dr. Rosch. Plaintiff believes that Dr. Rosch erred in four ways. Alternatively, to put it in plaintiff's own somewhat blunt words, "every single conclusion stated by the medical expert about Ms. Taimisto's blood disorders is baseless and completely wrong." *Id.* at 5. The Court will first discuss the four points individually and then look at them more broadly in the context of the other evidence.

**Transfusion.** Plaintiff argues that Dr. Rosch was unaware that plaintiff had a blood transfusion. Here is the specific argument: "The medical expert stated that there was no evidence that Ms. Taimisto had required a transfusion (Tr. 47), yet Ms. Taimisto had underwent a platelet transfusion following her bone marrow biopsy to combat the low platelet counts in her blood (Tr. 404, 405)." Dkt. #12 at 4. The Government argues that this transfusion was merely a precautionary action taken by Dr. Sreenivasappa after performing the biopsy in July 2011. Though not fully spelled out, the Government suggests that no transfusion was *required* as part of the primary treatment for the alleged ongoing blood disorder but instead was given as a secondary treatment for the possible side-effects of the biopsy. This Court finds the Government's description more persuasive. Here is how Dr. Sreenivasappa described the

8

"transfusion" in his notes: "[Patient] has tolerated the procedure well, she [has a] bit more bleeding than usual[;] hence in view of the low platelet count, [I] have advised that [patient] get a unit of platelets." R. 404. Other than this one "transfusion" (Dr. Sreenivasappa did not even use this word), the Court found no evidence suggesting that any doctor specifically recommended transfusions as an ongoing treatment. Stated differently, there is ambiguity about what Dr. Rosch meant when referring to there being no "*requirement* for transfusion." R. 47 (emphasis added). It should be remembered that Dr. Rosch's comment was made in oral testimony, not in a formal report, and plaintiff's counsel never asked any follow-up questions at the time.

**Bone Marrow Biopsy.** Plaintiff argues that the medical expert also missed the biopsy. There was apparently only one, which is the one referred to above. Plaintiff specifically argues the following: "The medical expert stated that Ms. Taimisto did not have a 'detailed bone marrow biopsy,' yet Ms. Taimisto did undergo a bone marrow biopsy and there is no indication in the medical records to suggest that the biopsy was not detailed given the fact that it was ordered by a hematologist[.]" Dkt. #12 at 4. Like the first argument, this one also attempts to extract larger conclusions from arguably ambiguous oral statements. In her testimony, Dr. Rosch twice referred to the biopsy issue. The first time she stated that she did not see "a *detailed* bone marrow biopsy;" and the second time, she stated that she did not see "a *recent* evaluation with a bone marrow biopsy or evaluation." R. 47-48 (emphases added). Both statements contain qualifications, raising a question as to whether she, in fact, thought that there was no biopsy at all. As for the "detailed" qualification, the Government points out that the "record did not contain a specific report about the results of a biopsy." Dkt. #13 at 5. As for "recent" qualification, this point seems to be true because, after the July 2011 biopsy, there was not another performed (insofar as this Court can tell) before the March 2013 hearing. So, it is far

9

from clear whether either statement was wrong. And, to be discussed below, the biopsy results were less than compelling.

**Missed Treatment Record From Dr. Sreenivasappa.** Plaintiff next argues the following: "Surprisingly, it seems that the medical expert completely missed the entire records of Ms. Taimisto's treatment with her hematologist, Dr. Sreenivasappa. In particular, the medical expert stated that she did not see a 'hematalogic evaluation' for Ms. Taimisto's 'condition' (Tr. 47). Yet, Ms. Taimisto saw Dr. Sreenivasappa on at least three separate occasions (Tr. 395, 403, 430)." Dkt. #12 at 4-5 (footnote omitted). The Court again finds that this argument requires a close parsing of ambiguous oral comments. As quoted above, Dr. Rosch stated that she did not see "a *recent* evaluation," leaving open the possibility that she still saw all of Dr. Sreenivasappa's records. The other reference does not contain the "recent" qualification but does refer to there being no "hematologic evaluation *for that condition*." R. 47 (emphasis added). The reference to "that condition" raises the question of whether Dr. Rosch was focused on the specific blood disorder of aplastic anemia. If so, then her statement would be accurate. It is true that Dr. Rosch did not mention Dr. Sreenivasappa by name. So it there is no way to know for certain whether Dr. Rosch missed these records or whether she merely found nothing consequential in them about the precise issue of aplastic anemia.

**Condition Not Persisting.** Plaintiff finally argues the following: "Additionally, the medical expert stated that Ms. Taimisto's conditions were not persisting (Tr. 48). Yet, the record indicates that Ms. Taimisto treated right up until her hearing for her blood disorders (Tr. 507, 555, 577)." Dkt. # 12 at 5. To support this claim, plaintiff cites to three visits to Dr. Vaewhongs, two in the latter half of 2012 and one in early January 2013. Here again, the context is not clear because Dr. Rosch's comment was in response to a question specifically asking about aplastic

anemia. *See* R. 48. Again, if this were the narrow focus, then the testimony is accurate because Dr. Vaewhongs did not diagnose her with aplastic anemia.

In sum, plaintiff's argument that "every single conclusion" by Dr. Rosch is "baseless" and "complete wrong" is itself not a fair characterization. But even if Dr. Rosch were confused or mistaken about these four issues, plaintiff has not explained how they fit into the larger evidentiary picture. Was this evidence probative on the larger question of whether plaintiff was disabled? Did the ALJ overlook this evidence? Plaintiff seems to take the position that if Dr. Rosch was confused on these four points, then plaintiff was *ipso facto* disabled. The problem with this assumption is that it overlooks the fact that much of this evidence was inconclusive or even undermined plaintiff's arguments.

Consider again the biopsy evidence. As an initial matter, whether Dr. Rosch considered this evidence, the fact remains that the ALJ did not overlook it because it is specifically mentioned in the opinion. Significantly, as the ALJ pointed out, the biopsy was *normal*. *See* R. 15 (ALJ: "She underwent a bone marrow biopsy, which was normal and primary blood testing was normal.").[5] Rather than support plaintiff's case, the biopsy seems to undermine it. Accordingly, it is hard to see how the biopsy result would have changed Dr. Rosch's opinion.

A similar point applies to the "persisting" argument. Plaintiff conclusorily states that she "treated right up until her hearing" when she saw Dr. Vaewhongs on multiple occasions in 2012 and 2013. But plaintiff fails to discuss the specific findings from these visits. Many of them are

---

[5] This statement was taken verbatim from Dr. Sreenivasappa's notes. *See* R. 395 (8/12/21 visit: "She underwent a bone marrow biopsy which was normal and primary blood testing was normal."). Based on this note, the ALJ was justified in asserting that the biopsy was normal. However, in her opening brief, plaintiff suggested that the biopsy results were *not* normal and that the ALJ therefore "mischaracteriz[ed] [] the findings of [plaintiff's] bone marrow biopsy." Dkt. # 12 at 2, 6. But this claim is not substantiated. Plaintiff specifically stated in her opening brief: "The bone marrow biopsy results showed trilineage hematopoiesis (Tr. 430), confirming a diagnosis of pancytopenia." Dkt. #12 at 2. But the citation for this assertion (page 430 of the record) is a 9/16/11 progress note by Dr. Sreenivasappa, and the only reference to a biopsy that this Court could find is the following: "The patient *does not recall* a bone marrow biopsy which shows trilineage hematopoiesis with no blasts or evidence of MDS (myelodysplastic syndrome)." R. 430 (emphasis added). This statement thus fails to support plaintiff's claim.

contrary to plaintiff's theory. Dr. Vaewhongs did not diagnose plaintiff with aplastic anemia, but instead continued to list her condition as only pancytopenia, a condition he did not seem to view as being especially serious. *See, e.g.*, R. 313 (9/21/11 progress note: "PANCYTOPENIA: currently *just* low platelet and low white blood cell count") (emphasis added; all caps in original). Dr. Vaewhongs also did not recommend that plaintiff see another hematologist. Pancytopenia was only one of several conditions for which Dr. Vaewhongs was treating plaintiff.[6]

But perhaps the most significant thread running through these notes is plaintiff's alcohol use. Dr. Vaewhongs repeatedly stated that plaintiff's use of alcohol was a possible cause for her symptoms. For example, in his notes from January 5, 2013, in which he opined that plaintiff had pancytopenia (described as "still low white blood cells and platelets; hemoglobin is normal"), Dr. Vaewhongs advised as follows: "absolutely no more alcohol as it is [a] direct toxin to bone marrow that makes the white blood cells and platelets and red blood cells." R. 577. Dr. Vaewhongs consistently urged plaintiff to refrain from using alcohol. *See, e.g.*, R. 310 (10/21/11 visit: "stop all alcohol consumption"); R. 556-557 (10/30/12 visit: "absolutely no more alcohol (alcohol is cause of your low platelets and low white blood cells" and "NEED to stop ALL ALCOHOL") (all caps in original). Dr. Vaewhongs was not the only one who speculated that alcohol abuse was a possible cause of plaintiff's various symptoms. Dr. Sreenivasappa raised concerns.[7] Dr. Rosch twice mentioned alcohol as a factor. *See* R. 47 ("she has had a history of alcohol abuse"); R. 48 ("it is noted in the record that she had used alcohol, and this may be a factor"). The ALJ cited to this evidence throughout the opinion and noted that plaintiff ignored

---

[6]Pancytopenia is the pronounced reduction in the number of erythrocytes, all types of leukocytes, and the blood platelets in the circulating blood. Stedman's Medical Dictionary, 1411 (28th ed. 2006).
[7]*See, e.g.* R. 357-58 ("On physical examination, also it was found that the patient had splenomegaly and some spider nevi in the upper chest, so hence there is a concern for cirrhosis of the liver. Per history, the patient states that she does not drink alcohol, occasionally drinks alcohol, has never been a heavy drinker.").

12

doctor's instructions to stop drinking. *See* R. 21 ("the claimant continues to drink alcohol despite being advised by her physicians to avoid all alcohol consumption"). But in her two briefs to this Court, plaintiff never addressed this point.

Plaintiff's narrow focus on the four errors allegedly made by Dr. Rosch also ignores other important independent reasons in the ALJ's opinion. The primary issue was whether plaintiff had the ability to do light work, not which precise blood disorder she may have had. As support for his RFC determination, the ALJ noted in the opinion that plaintiff engaged in a wide range of vigorous activities. *See* R. 13 (plaintiff to Dr. Peggau: "I usually walk 3 miles a day."); R. 15 ("On March 10, 2011, the claimant stated that she was not exercising in the wintertime, but weather permitting, she did gardening and walking daily on bike path."); R. 15 (On July 21, 2011, she "said she was able to walk around the house, did gardening to help one of her previous employers, and walked about 2-3 miles a day.").

The ALJ also noted that doctors on many occasions found that plaintiff had normal functioning or reported no problems. Dr. Ramchandani, the consultant, found that plaintiff was able to move around adequately during the examination. R. 16. The ALJ noted that plaintiff had visited Dr. Wall who found that she appeared "as healthy as ever, but now quite overweight" and that she reported "[h]er pain scale [] as 0/10." R. 15. On February 16, 2012, an emergency room doctor (Dr. Oh) noted that plaintiff "was ambulating throughout the waiting room in a comfortable manner." R. 17. On July 27, 2011, Dr. Sreenivasappa noted that they had "done a battery of tests which included a ferritin, vitamin B12, folate level, TSH, T3, T4, *all of which have been normal*." R. 404 (emphasis added). In what appears to be her last visit with Dr.

Sreenivasappa, plaintiff stated "that she is doing fine" and "does not have any problems or complaints." R. 430.[8]

Credibility was another reason for the ALJ's decision. The ALJ found that plaintiff lacked credibility based several pieces of evidence. The ALJ noted that Dr. Peggau suggested that plaintiff "was engaging in possible malingering" when she pretended to feign a leg injury; Dr. Oh, the emergency room physician, "noted that the claimant was not entirely forthcoming, being resistant to evaluation by history or exam"; plaintiff quit working not because of a disability but because she "was caught stealing narcotics from the pharmacy; plaintiff stated that she had a hard time finding a job "due to her felony record"; and plaintiff testified at the hearing that her daily activities were more limited than what she had been telling doctors earlier. R. 22. Plaintiff has not challenged these findings here.

Overall, the ALJ's opinion discussed the medical evidence in much more detail and at more length than did plaintiff. Plaintiff focuses heavily on the testimony of Dr. Rosch, but this is not a case where a medical expert was offering an opinion contrary to a clearly stated opinion from a treating physician.

Aside from her argument about Dr. Rosch, plaintiff offered only one other argument in her opening brief. It is much less developed, consisting of the following couple of sentences in her opening brief: "Also, the ALJ completely ignored the most recent treatment records which indicated that Ms. Taimisto's treating physician thought that she needed a cane, physical therapy, and a brain MRI related to memory difficulties (Tr. 577). These findings support Ms. Taimisto's testimony, rather than contradict it. Here, the ALJ violated his duty to develop the record, necessitating a remand." Dkt. #12 at 6. This argument focuses on several comments extracted

---

[8]Related to the above point, the ALJ also noted that plaintiff often attributed her problems to situational stressors, such as her husband going to prison. *See* R. 15 ("The claimant thought her headaches were related to her stress level."); R. 15 ("the claimant stated that she has been depressed and overeating because she has been out of work").

14

from the one page of notes from the January 5, 2013 visit to Dr. Vaewhongs, the visit already discussed above in connection with the alcohol issue.

In light of all the other evidence relied on by the ALJ, the Court finds that any failure by the ALJ to specifically discuss these points is harmless error. As noted above, in this one progress note, Dr. Vaewhongs made several observations undermining plaintiff's case. These include the assertion that her alcohol use was the chief cause of her blood disorders and poor memory. The specific point about using a cane is not even included in the section discussing blood disorders. Moreover, although plaintiff states that Dr. Vaewhongs "required" her to use a cane, he did not use this word. It appears to be more of a suggestion. As for the comment that plaintiff get an MRI, this again did not relate to the alleged blood disorder and there is no urgency to this suggestion, at least as evidenced by the doctor's statement that "ideally" plaintiff should get a scan. On top of all these facts, at the end of this note, Dr. Vaewhongs wrote, in response to plaintiff's questions about her disability claim, that his office does not do disability determinations because they lack the "equipment to see what you can and cannot do." *Id.*

Another reason why the Court finds that this argument is harmless error is that plaintiff never previously focused on it. In her testimony, plaintiff never indicated that she was currently using or needed to use a cane, or that her doctor required her to use one. Although she was not specifically asked whether she used a cane, she repeatedly described doing various activities such as shopping and gardening, but never mentioned using a cane. She routinely walked two to three miles, but did not refer to needing a cane. Plaintiff's counsel made an opening statement, asked plaintiff questions, asked the medical expert questions. But again, he too never raised the cane issue. For these reasons, plaintiff's second argument is unavailing.[9]

---

[9]Plaintiff initially framed this argument in terms of the duty to develop the record. In her reply brief, plaintiff re-framed it as one under the treating physician's rule. However, these arguments were not raised in plaintiff's opening

To sum up, plaintiff is arguing for a remand largely based on the claim that uncertainty remains about her blood disorder. Further analysis, she believes, might provide a clearer answer. She proposes that the ALJ could submit medical interrogatories to Dr. Sreenivasappa. However, she has not marshalled the evidence to show why it is reasonable to suppose Dr. Sreenivasappa would offer any opinions different from those already provided. Although an ALJ has a duty to fully and fairly develop the record, the Seventh Circuit has also indicated that it will generally defer to the ALJ's reasoned judgment as to when further inquiry is warranted. *See, e.g., Nelms*, 553 F.3d at 1098 ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."). Additionally, the plaintiff was represented by counsel at the administrative proceeding. Counsel should not hide in the weeds with the plaintiff's best argument, only to spring that argument on the Commissioner on appeal. Based on all the above reasons, the Court cannot find that the ALJ abused this discretion.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the ALJ's decision is affirmed.

Date: May 31, 2016    By: _____
Iain D. Johnston
United States Magistrate Judge

---

brief. Moreover, for the many reasons already stated above, the Court does not find that Dr. Vaewhongs provided any opinions supporting a different RFC determination; therefore, the Court need not further analyze this argument.

16